The next case for argument will be Territory of American Samoa versus the National Marine Fisheries Service. May it please the Court, Robert Lyman representing the National Marine Fisheries Service. I plan to reserve five minutes for rebuttal. American Samoa filed suit challenging a 2016 rule that was approved by the Council and then issued by the Service Center of the Magnuson Act. The 2016 rule revised an earlier 2002 rule and in the 2002 rule the agency established a large vessel prohibited area around American Samoa. That rule restricted fishing by long line vessels from American Samoa within 50 miles of the islands and the purpose was to provide an exclusive area for smaller ALEA fishing vessels that were also from American Samoa. But by 2013 and 14 there have been a significant decline in the number of ALEA vessels fishing and the long line vessels fishery was collapsing. So the agency didn't get rid of the prohibited area but shrunk it from a 50 mile prohibition to 12 miles. And American Samoa then sued the agency to challenge the rule. Is it true that in making this determination to shrink the area that the record does not reflect consultation or consideration of the sessions? The sessions are addressed in the final rule in the sense that there's a comment from American Samoa saying you should consider the sessions. The agency says, here's the response, the rules necessary for these There's no discussion of what the sessions mean and the response. That doesn't matter because of four reasons here. The first is American Samoa lacks standing and either on a parents patriae theory or on a direct injury theory. The second reason is even if the sessions...the sessions here don't protect collective fishing rights, they don't refer to fishing rights of any sort, so there's not any applicable law there that the agency has to consider. Even if they did protect some sort of fishing rights and there's no language in the session saying so, they wouldn't apply at the high seas area which is more than three miles beyond American Samoa. This rule, the part of the rule they're challenging only has effect more than 12 miles beyond. And fourth, even though the sessions aren't expressly discussed in the rule, the communities and on the Aleut fishing that American Samoa is concerned about. And I'll start with standing and parents patriae standing. American Samoa faces the same problem here that all 50 states have when they sue the the federal government, which is there is no parents patriae standing to bring suit against the federal government for the states or for American Samoa. And this is a settled issue. The Supreme Court announced this rule clearly in the SNAP decision. Back before that, there's Massachusetts versus Mellon. And from this court, it's very clearly held the same in Nevada versus Burford. So the result is most of the district court's analysis of standing is wrong because of this bar on American Samoa or a state suing the federal government on a parents patriae theory. American Samoa cites to the Massachusetts versus EPA Supreme Court decision, but what's lacking from that decision is any indication that that Supreme Court was reversing this long settled law. It doesn't say it was reversing SNAP or Mellon. It doesn't say it's getting rid of the parents patriae bar for states. And it's holding is based on Massachusetts property interests. Its interest is a landowner on coastal land and not on a parents patriae theory. But going back, I don't see the Mellon bar as categorical if you read in SNAP the language which talks about a state not having standing to bring an action. But it limits that to relations with the federal government. So this is a distinct and different, as pointed out in Massachusetts v. EPA. So I'm having some trouble. If I understand your argument, you said, well, Massachusetts v. EPA didn't overrule Mellon. You're correct. But the question is, is it complementary or consistent with Mellon? I think it's perfectly complementary and consistent with Mellon and SNAP and this court's decision in Nevada versus Burford, which is probably the most like the situation we have here. There, the state of Nevada sued the Bureau of Land Management and said, you, the Bureau of Land Management, have taken an action that's inconsistent with federal law, the National Environmental Policy Act. It should be set aside. And this court said, no, you can't use parents patriae standing to do that. And that's exactly what we have here. We have American Samoa saying, no, agency, the Fishery Service, your rule is inconsistent with the Magnuson Act, which requires consistency with other applicable law, including these sessions. So it's maybe a matter of semantics, but I think it's more than that. Because in the Burford case, basically, aren't you in that first part of the Massachusetts v. EPA footnote, which is that the state was being, was suing to protect from the operation of the federal statute. And here, this is a state, or in this case, a territory, asserting a right under federal law and the right that it asserts, which you, I know you disagree with the derivation of the session rights with respect to waters. But let's just assume that it's covered. Isn't that a different type of lawsuit than the Burford lawsuit? I don't think so. It's the same challenge to a federal agency action. It's the same argument that the federal agency has violated applicable law. And if the federal agency can't do that because it's harming the people of the state. And I think the other critical point here is, I think the Manitoba DC Circuit decision's reading a footnote 17 here, which the court just issued, we addressed this in our reply brief, is exactly right. That that discussion isn't about the scope of parents patriae standing, but it rather relates to that court's preface about states receiving special solicitude in the standing analysis. When it comes time for that court, the Massachusetts versus the EPA court, to analyze the injury, it's not wrestling on parents patriae. It's saying direct harm to state lands, and that's what causes... Why Massachusetts has standing. So I don't think footnote 17, as the DC Circuit explained in the Manitoba case, means that the parents patriae standing has been scaled back in a way. The rule about the so called melon bar, as the DC Circuit calls it, has been scaled back in that way. Well, let me ask you about that. Is this distinction between direct standing and parents patriae standing really a false distinction, and that they really collapse in a case like this? Where the territory, as I understand it, is asserting the rights of its populace and its citizens with respect to the cultural values. Why isn't that direct standing? I guess that's not direct standing, because it's asserting the rights of its people. And specifically, it's not asserting its own right. And so when it's direct standing, it's the state saying, as in Massachusetts, example of, we own land, climate change is causing sea rise, it's taking away our land, we are directly injured by your action. Or the other time when there's direct standing is when a state says, look, your law requires us, a state or a territory, in America's smallest case, to do X. We have to do something that we don't want to do, and that infringes our sovereign right to not do that. And that's not... And I appreciate that distinction, but I guess the question here is, why isn't it the territory's cultural rights, which are... They're not equivalent to tribal rights, as we think of a sovereign, but why as a quasi sovereign, why isn't that equivalent to saying that as a culture, as a territory, that's what we're protecting? Well, I think that could be a quasi sovereign right, but it's not a sovereign right, and it's not a direct injury. It's in that quasi sovereign basket, which is exactly what Parents Patria is for. And that's what you have to show to create Parents Patria standing, is establish a quasi sovereign right. And here, what they've articulated is a quasi sovereign right to their people, their culture, and it flows from the people, the American Samoan's way of life, and that's not a direct interest of the government, and it's not a direct property interest, and it's not a direct sovereign interest in their governmental process either. So I think it fits in the quasi sovereign category, which then means it falls under Parents Patria. Even if you look at this as a direct right, and we don't think it is, but if you do, they still have an established standing to survive the summary judgment stage. What they point to, and the district court relied on, the only assertions from American Samoa are in the rulemaking process saying, we have concerns about impact on alea fishing, and we think that could then impact our culture. And that's not good enough. They need a declaration or an affidavit from American Samoa government officials spelling out how they are injured, so they can show the concrete, actual injury in fact that they need for standing. And they haven't gone down that path, and they've instead relied primarily on this Parents Patria theory that we think is flawed, but even if you conceive of it as a direct injury, they still haven't met their burden for standing. Is that old also where it's a procedural injury? In other words, it's not their obligation to come forward to say exactly what the cultural damage is, but only for NIMFS to consider the cessation and what it means and what the cultural implications are. I don't think they've made a procedural injury argument, so I think that's missing from their briefs. I don't think it's before the court. Just wanna make sure. So you don't think they've made an argument that the failure to consider the sessions is a foundation for remanding? Well, we're asking for reversal, but they have argued that NIMFS should have considered the sessions. What they're lacking is a procedural right, as in Massachusetts versus the EPA, where the court said, here's a procedural right that's relevant to standing. You have the right to petition and the right to sue on it, and that's part of the Clean Air Act, and also part of the APA. But they haven't identified that sort of failure here, where there's a statutory procedural right under the Magson Act that has not occurred. They instead say, we have a substantive claim that reducing the large vessel prohibited area violates the text of the sessions. And that's the error. That's their argument. Since I'm getting close to the rebuttal time, I wanna move to the merits. And our argument there is pretty simple. The sessions don't protect fishing rights because they say nothing about fishing rights. And you can read the sessions, and there's discussion of individual rights and rights to property and land, but there's no discussion of rights to water or fishing rights. And so we think on the merits, that alone is enough to defeat their argument. And even if there was some discussion of fishing rights, those were then ceded to the United States because the sessions cede all runway transfer of authority, all sovereign rights to the United States in the sessions. Even if you disagree with us on that argument about the sessions, we still have this argument about the high seas, which I don't think there's been much of a response to in their brief. At the time, no one had rights beyond three miles from shore. It was the high seas. It was open to all. There were no sovereign rights of any country in the early 1900s, at the time of ratification, in these waters. High seas, open to all. And so the idea that the sessions... High seas beyond three miles? Beyond three miles at the time. Now, there's been later developments on that, that post-date the sessions in the 1929 ratification, but the time was three miles. The rule here is more than 12 miles. And so they would not have had any sort of sovereign or property right beyond that three mile mark. And so the sessions just would not have reserved, could not have reserved any sovereign or property right in that area. And even if there's a colorable claim on standing, they would lose on the merits of the interpretation of the sessions? Right. Even if there's a colorable claim on standing, they lose on the plain language of the sessions. Even if you disagree with us, as the district court did, and infer some sort of right that we don't think is there, it still doesn't work, because it runs into this high seas problem. Because the issue here is beyond the three mile mark, the LVPA, the Large Vessel Prohibited Area, now applies up to 12 miles, and their complaint is it doesn't apply up to 50 miles. And the high seas line was the three mile line. So we're well beyond that in an area where there were no sovereign rights at the time. I don't wanna take up too much of your time, because I know you wanna reserve rebuttal time, but I have a couple of questions for you. So assuming the government of American Samoa had come forward with a claim that one Aaliyah fisherman would be injured, is that sufficient to confer parents patriae standing? And then my second question is, I believe I heard you say earlier that in this process, the National Marine Fishery Service actually considered these concerns, these fishing rights concerns, in response to comments. So what would happen if the summary judgment were upheld in this return to the agency? What would the agency do? Would the agency do anything differently? So the first question, there is an affidavit in the record from a single Aaliyah fisherman that they submitted that says, I think this rule harms me. But that doesn't create standing for American Samoa for two reasons. One, it doesn't work on their parents patriae. And in fact, it underscores that there's a distinct group of people who could be harmed by this rule who could sue. And in that case, parents patriae standing is not available. Don't they also say in the parents patriae, though, that you have to have an underlying harm to a citizen, and that's probably the reason they submitted the affidavit or the declaration? Well, you have to have an injury to a quasi sovereign interest. I don't know if you need to have a... It's not just equivalent to when a non governmental organization sues and you have to show an injury to a particular person. I think it's actually the opposite. If you look in SNAP, the issue is whether hundreds of people were a small enough group that parents patriae would not be available. Here, we're talking a single declaration from a single Aaliyah fisherman, active at the time of the rule, between one and three Aaliyah fishermen, and historically active, maybe 20. So it's a discrete group that could have sued directly instead of the American Samoa government, who then could have participated by way of amicus brief, or as an additional party. Once one party has standing, then other parties can participate. To Judge Beatty's second question, yes, the agency here looked at the impact on Aaliyah fishing, and that's what the rule is all about. It's about balancing between the impacts on long line fishing and the larger vessels that long line and the Aaliyah fishing. And the result was, after analysis of the impacts on both, we think this adjustment balances those interests the best, and that's what the agency then did. And so it took a look at exactly... If American Samoa is right that the sessions are relevant here, it's because they protect community Aaliyah type fishing. And the agency here took a look at the impacts on community Aaliyah fishing, and the impacts on the American Samoa community as well, as it has to under the statute, putting aside the sessions, and considered, based on the record, that those impacts would not be significant. Well, I think there might be a difference between talking about Aaliyah fishing in a narrow sense, and talking about cultural protection in a broader sense, which the sessions talk about. So that's where I was concerned that you might have mentioned in the administrative hearing that, yeah, we looked at Aaliyah fishing, but is there anything in the record that talks about this long standing principle that the culture of American Samoa would be protected? Well, I think what the agency did look at is the... So I guess the answer to that is yes or no. The answer to that is they've looked at impact on fishing community, which is American Samoa community impact. And the analysis was, no impact here because we're not gonna have a negative impact on Aaliyah fishing, and that's the hook. That's how the fish get from the waters to the community. We're not impacting that piece, so we're not impacting all the community practice that's built around fishing and fish that American Samoa is concerned about. The only last point before I reserve my minute is about cultural practice. I don't think it's... I don't think the sessions protect cultural practice broadly. I think it's a specific contextual land, other property, and reference to cultural practice in that category. When you read those all together, I think it's talking about individual rights to land and not a collective right, for example, to fishing, which we don't think is in the session. Thank you. Thank you. Ta'alofa. Good morning, Your Honors. My name is Talawenga Eleasalo Wa'alele'ale, Attorney General of American Samoa, and I'm honored to be here to represent the people of the territory of American Samoa in this important case. Your Honors, also present here today is the Honorable Le Manu Pelechimoma, Lieutenant Governor of American Samoa, and he's sitting in the back there. I just wanna inform the court of that. He's here on behalf of the Governor of American Samoa, representing him in  this case. This is not your typical case, in some ways, but it's not unusual for the Ninth Circuit to address issues of Native cultural rights, and that's what this case is about. It's a case about protecting the cultural rights of a people that have sworn to be part of the United States government, the greatest country in the world. And the foundation of this union was based on the protection of cultural rights. Counsel is absolutely correct. When my forefathers signed that deed of cession to give up our lands and our sovereignty, we gave everything. We held nothing back. The only thing we held back was protection of our culture. And what did the United States government do with that document? They converted it into federal law. It's part of federal law that this agency should have considered, but they did not. And the court is absolutely correct. And the petitioners have admitted they did not consider the deeds. What did they consider? They considered the Paper Reduction Act. They thought that was more important than the deeds of cession that protects the culture of a people over 120 years old. They considered the Information Act. Again, they thought that was more important. They wrote studies and papers submitting their recommendation for approval of this law or this regulation, saying that they've considered all those things.  The petitioners have argued that we do not have standing to be here. We respectfully disagree. Whether it's parents' patriotic, whether it's Article 3 standing, whether it's special solicitude, Judge McEwen is correct. For this case, all of these principles collapse into one. All three rivers lead to the ocean of standing for American Samoa in this case. Article 3 standing, as we stated from the beginning, there is a substantive injury in this case, and that is preserving the right, the cognizable right of the American Samoa government to preserve its culture. This is a question that's not troubling, but I think we've got to find an answer to. They argue three miles, or 12 miles, or 50 miles, and you, I think, say your culture requires 50 miles. Where do we look to see that 50 miles is a part of the culture, that you've fished 50 miles? Yes. The Deans of Session identified an area that totaled approximately 28,000 square miles. Most of this area was ocean, and that's the area that our forefathers agreed to give to the United States, and the United States agreed to accept that and acknowledge that that is ours, and they're going to protect our rights in that area. So that's the basis. I have no doubt about that, but what I'm wondering, where do we know that traditionally you've fished 50 miles? We know this from the agency record itself. There is studies that were done there that shows the cultural history of fishing in American Samoa is tied directly to its culture, and then the fishing boats, alia fishermen fish as far as 30 nautical miles away from the waters. Also, this is a culture of, this is an island group. These are Polynesians. But I think we're talking about 50 miles, aren't we? 50 miles is the rule that was established by the agency back in 2002, and that rule, in our view, protected, provided the protection we needed to nurture and preserve this culture of fishing, because it's not just fishing in the ocean. It's the activity that happens on land. You know, fishermen go out fishing. When they bring their fish, it's distributed communally to the village, to the pastor, and so this is not just an ocean activity. The impact of taking away this protection affects the land and affects the culture of the people on the land. That's another point I believe the government brought up, is how you interpret the sessions, because they talk about, well, one of them talks about lands and other property, and the other one talks about property according to customs. So, has that ever been interpreted as to whether that property includes fish itself as a piece of property, or ocean rights, or anything beyond the physical land that is the territory of Samoa? Let me approach the question this way. The Hodel decision by the D.C. Circuit is one decision that confirms that the two deeds are to be interpreted together, because they talk about the same area, and if you combine the two deeds, what it says is that the United States will protect the culture of these Native peoples within the area, within the deeded area, and that's what we're asking for. Now, add that to this court's decision in the Parovano case, where the court can infer cultural rights from the text of the document, and then finally, we have the Cougar Den decision by the U.S. Supreme Court, where in that case, the only right provided in the document was the right to use the roads, but based on the interpretation by the Supreme Court, it not only included the right to walk on the road, but to carry goods on the road. That's no different from this case. What we're saying is the U.S. government agreed to protect our cultural rights within the ceded area, the 28,000 square miles. There's no question, and the agency admits that our culture includes a culture of fishing within that area, and so I think it's very reasonable under Parovano and Cougar Den for this court to confer, to conclude that the deeds include the right to fish. Can we go back, though, to the three-mile question, because I don't know how many, I don't know what 28,000 square miles is, actually, but we're usually familiar with talking about the three-mile limit. At least, we were historically. So, counsel for the government says, well, at the time of the sessions, when we talked about high seas vis-a-vis U.S. jurisdiction, we were talking about three miles, and therefore, these can't be interpreted to be something beyond that, and I would appreciate your explanation on that point. I would approach it this way, using the principles of Cougar Den, that these decisions should be interpreted from the standpoint of the natives. The concept of high seas is not a native concept. It's not a concept that the Samoans and the Polynesian acknowledge. This is a European concept. These superpowers came down, and these concepts came up, and that's what we live in, and we agree we're living on it. But the interpretation of this agreement should be interpreted based on the understanding of the natives at the time when they entered into this agreement. As far as the chiefs of Samoa, Tutuila, Aonua, and Manua are concerned, they owned all of these waters, and they fished, and they agreed to give it up, too. So the high seas concept, to us, is a red herring. It doesn't apply here at all. So in our case law, in the Ninth Circuit, in Coaster v. Harris in 2017, the court set out requirements to approve or plead parent patriae standing, and one aspect of that is that the territory, in this case, must prove a substantial number of its citizens have Article III standing. So there is one declaration in the record. The declaration doesn't indicate that the person who signed it is actually a citizen of American Samoa, but setting that aside, we have a declaration from one person, and we have information in the record that there's one Alea fisherman at this so that it's a substantial number of its citizens who have Article III standing. Thank you, Your Honor. The question assumes that this case is just about fishing. It's not. It's about protecting culture. The government of American Samoa initiates this lawsuit to ensure that people who practice the cultural fishing practices continue because their practicing of culture benefits all of us. It ensures the preservation of our culture, and as I said earlier, it's not just the people fishing. It's the activity that happens after the fishing is done. The distribution of the fish, the sharing. Most of these fishermen don't fish to make money. It's part of cultural obligations. Villages gather. They go fishing. That's the harm that the American Samoa government is trying. It's an actual harm to the American Samoa government because the government has an obligation under the Constitution to protect culture, and that, as recognized by the D.C. Circuit in the Hodel decision, that's a federal congressional policy to protect the culture of American Samoa, and this ruling by the agency is a direct injury to us because it impacts our ability to protect culture. It impacts our constitutional obligation. In the Sausalito case, that's what this court found. Federal action that impacts a local government's ability to execute their duties is basis for standing. That's what this court held in Washington Utilities' case, where the agency in question was provided under state law the right to protect the communications right of the people of Washington State. This court held that was sufficient for standing because the federal action in that case interfered with the local government's ability to execute their obligation. This is exactly what's happening here. This rule inhibits our ability to fulfill our obligation to the people of American Samoa, and that's why we're injured, and removal of this LVPA ruling relieves us of this obligation so we can continue to protect culture. Direct evidence was presented to this court by the affidavit of one fisherman speaking on behalf of a group of fishermen. Evidence was presented by a comment letter by one fisherman alleging the record, page 333 of the record, alleging that the removal will impact his ability to fish. The affidavit is in page 33 of the record. The public statement of another fisherman, page 327, also talks about the impact of this rule on their ability to fish. That's what the American Samoa government is trying to protect. We want these people to continue fishing, whether they need money or not. It's the action of fishing that preserves our culture. There's also the statement from Governor Lolo Molina, page 289 of the record, where the governor speaks about a specific project that is sponsored by the American Samoa government, the Super Alia project, and the governor said the entire purpose of that project is to encourage local fishermen to go fishing using traditional methods. That too, that state project, is impacted by this decision. Again... Something else that puzzles me as I look at this is before 2002, as I understand it, there was no long vessel prohibition area. So those vessels could fish much closer than 12 miles from the coast. This is even years after the Manxon Statute was passed, I think in 1976. So in 2002, a rule was promulgated to create the 50-mile circumference around America Samoa and prohibit the long vessels. And as I understand it, that rulemaking did not expressly consider or talk about the sessions, but nobody objected to it then. But now, when that area is reduced, there is an objection. Why is it different? Why did it not matter that they didn't consider the sessions in 2002? Because the ruling was favorable to protection of culture. And, you know, me as attorney general and the administration were not there. The fact that we didn't assert our rule now, and we're definitely asserting it now, the 2002 rule, it completed a record, statements by the agency, that was done to protect the culture of American Samoa. Now, the removal of that will absolutely destroy the culture, and we presented specific evidence. Let me turn to the issue of procedural standing. We have asserted procedural standing. We did so in our complaint all the way through the summary judgment argument. And then the procedural argument, basically what it requires is that the MSA requires the agency to consider the deeds of session as applicable law. Now, there's no dispute that they failed to do that. In fact, they said the deeds of session are irrelevant. Their refusal to consider the deeds threatens the concrete interests of the American Samoa government to preserve the culture of Samoa for all American Samoans, including those American Samoans who own long lining fishing boats. Well, this also could be a case for you when the battle lose the war in the sense that the government says they already considered the Aaliyah fishermen. So, if it were to go back and they were to say, well, we already considered the Aaliyah fishermen, and then they write into the review document, including the sessions and the cultural impact, then you'd be in a hard place under the standard of review to get any further relief, wouldn't you? We would prefer that they consider the deeds. We are asking the court to require the agency to follow federal law. The federal law requires them to consider applicable law. The deeds of session is an applicable law, just like the Paper Reduction Act, the Information Act are considered relevant law. Whether or not this court concludes that the deeds of session covers fishing, the mere fact that the deeds of session covers the entire area under the jurisdiction of this agency, that alone is sufficient for it to be considered applicable law. So, let me just turn briefly on the issue of, on the merits. As I've stated earlier, the deeds of session, in fact, cover cultural fishing rights of the American Samoa people. And under the principle of Cougar Den, as well as this court's decision in Paravano, that's the only resolution of that case that is possible. The defendants or the petitioner keep saying that they didn't review the deeds, but they considered the impact of the ruling on the Aaliyah fishermen. That's not sufficient. The deeds of session covers more than just Aaliyah fishing. Like I said earlier, it covers and protects culture. The culture of the American Samoa people, it doesn't just exist out in the deep ocean. It exists on the land. And because of that, they fail to consider Because who would make a determination as to what is the scope of the deeds of session? In other words, if we were determined that there's a colorable claim and that the deeds of session were not specifically considered, would that go back to the agency for testimony on the scope of deeds of session? Or is that a question of law that's decided before a remand? Your Honor, I see that my time is done. Let me just briefly say that the district court has determined based on the evidence, communications directly from the agency itself, that they did not consider. They could not have considered it. I know that, and I'm asking you who would make the determination initially as to the scope of what the sessions cover. I believe that's an issue of law for this court to determine what the deeds provide, and I think the evidence that we presented to the court, the legal arguments of the court below, shows that the deeds of session include the right to fish, just like the Indian tribal rights in the Paravano as well as the Cougar Den case. Thank you, Your Honor. Thank you, Your Honor. Just a few points. I'll start with standing. The Attorney General said the injury here is to American Samoa's cultural practices. That is a quasi-sovereign interest. They have to show parents patrie standing, meet the requirements, and they haven't here. As to the impact on the Alea fishermen, that just underscores there is someone out there, a person who has a direct injury, who could have sued and had standing, but that's not this lawsuit. There's no one in this lawsuit who's a plaintiff other than the territory of American Samoa. He mentioned the Washington Utilities case. That's reversed at the end of Nevada versus Burford. It says that's no longer good law. That's before the SNAP decision, Washington Utilities, and it's reversed in Nevada versus Burford. As to the merits, there's just no language in these sessions creating the right that they want, a generic protection of all cultural rights and practices. There's a mention of waters, but those waters are seeded. That's not the reference to cultural practices or rights that they need to prevail here, and they try to backfill that with sites to the Paravano and Cougar Den. Those are about Indian treaty rights, reservation rights. There's specific languages addressed in those cases about reservations for Indian purposes and to be used as Indians have used them, and that language just isn't here in the sessions, and because it's missing from the sessions, those cases are distinguishable, and their claim fails on the merits too, even if you get beyond standing. I see my time's up. Happy to answer any questions, but otherwise, we ask for a reversal. Thank you. I would like to thank both Council for excellent arguments and your command of the cases as well as the briefing. It's very good on both sides. The case of Territory of American Samoa versus National Marine Fisheries Service is submitted.
judges: Farris, McKeown, Bade